UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MUHAMMAD S. FARRAKHAN (a/k/a ERNEST S. WALKER), *et al.*,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>CHRISTINE O. GREGOIRE, *et al.*,<br><br>　　Defendants. | NO. CV-96-076-RHW<br><br>**ORDER GRANTING DEFENDANTS' MOTION, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Before the Court are Defendants' Motion for Summary Judgment (Ct. Rec. 215) and Plaintiffs' Motion for Summary Judgment (Ct. Rec. 230). Oral argument was heard in Spokane, Washington, on April 20, 2006. Plaintiffs were represented by Ryan Haygood and Lawrence Weiser, along with student-attorneys Jacob White and Kris Olmstead. Carol Murphy and Daniel Judge appeared on behalf of Defendants. For the reasons stated below, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

Plaintiffs initially filed suit on February 2, 1996. Their fourth amended complaint alleges Washington's felon disenfranchisement and restoration of civil rights schemes result in the denial of the right to vote to racial minorities in violation of the Voting Rights Act ("VRA"), 42 U.S.C. §§ 1971, 1973. Both parties filed for summary judgment in 2000, and oral argument on those motions was presented on November 3, 2000. The Court denied Plaintiffs' motion and

granted that of Defendants by order on December 1, 2000 (Ct. Rec. 153).

Plaintiffs appealed that order to the Ninth Circuit. The Circuit affirmed in part, reversed in part, and remanded. The panel affirmed this Court's ruling that "Plaintiffs lacked standing to challenge the restoration scheme because they presented no evidence of their eligibility, much less even allege that they were eligible for restoration, and had not attempted to have their civil rights restored." *Farrakhan v. Washington*, 338 F.3d 1009, 1022 (9th Cir. 2003), *cert. denied sub nom Farrakhan v. Locke*, 543 U.S. 984 (2004) (*Farrakhan I*). However, the panel reversed this Court's determination that

> although Washington's felon disenfranchisement scheme disenfranchises a disproportionate number of African-American, Hispanic-American, and Native-American minorities, the cause of this disparate impact on their right to vote was external to the felon disenfranchisement provision *itself* and therefore could not provide the requisite causal link between the voting qualification and the prohibited discriminatory result.

*Id*. at 1011 (emphasis in original). The panel explained that reversal was necessary because § 2 of the VRA requires a "totality of the circumstances" inquiry, meaning courts must "consider how a challenged voting practice *interacts with* external factors such as 'social and historical conditions' to result in denial of the right to vote on account of race or color." *Id*. at 1011-12 (emphasis in original) (citations omitted). The panel found that "evidence of discrimination within the criminal justice system can be relevant to a Section 2 analysis[,]" *id*. at 1012, and it remanded to permit this Court to "make any requisite factual findings following an appropriate evidentiary hearing, if necessary, and [to] assess the totality of circumstances, including Plaintiffs' evidence of racial bias in Washington's criminal justice system." *Id*. at 1020.

Notably, the panel did not hold that the outcome of this Court's decision was incorrect; instead, it found (1) the Court's method of reaching its decision did not take all relevant factors into account, and (2) the Court used an incorrect analysis to determine causation under the VRA. *Id*. at 1020 (explaining that "had the

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 2

district court properly interpreted the causation requirement under the totality of the circumstances test instead of applying its novel 'by itself' causation standard, the court *might* have reached a different conclusion" (emphasis added)).

Defendants petitioned for rehearing to the panel and *en banc*, and both petitions were denied. *Farrakhan v. Washington*, 359 F.3d 1116, 1116 (9th Cir. 2004) (*Farrakhan II*). The *Farrakhan II* dissent raises questions regarding the constitutionality of applying the VRA to felon disenfranchisement laws, and these concerns are echoed and elaborated upon in recent *en banc* opinions issued by the Second and Eleventh Circuits. *Id.* at 1121; *Hayden v. Pataki*, — F.3d —, 2006 WL 1169674 (2d Cir. May 4, 2006); *Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir. 2005) (*en banc*), *cert. denied sub nom. Johnson v. Bush*, 126 S.Ct. 650 (2005). Considering these opinions, this Court continues to have concerns regarding the constitutionality of applying the VRA to Washington's felon disenfranchisement provisions. However, the Court will conduct its analysis based upon the remand of *Farrakhan I*, assessing the totality of the circumstances, including Plaintiffs' evidence of racial bias in Washington's criminal justice system, to determine whether Washington's felon disenfranchisement laws violate the VRA. 338 F.3d at 1020.

## **STANDARD OF REVIEW**

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

///

**FACTS**

As was the case in 2000, the facts in this matter are not in dispute. Plaintiffs are convicted felons, and they are also African-American, Hispanic-American, or Native American. Each Plaintiff has been disenfranchised under Washington Constitution Article VI § 3, which denies the right to vote to all persons convicted of an "infamous crime." None of the Plaintiffs has had his civil rights restored under Washington Revised Code § 9.94A.220. Plaintiffs allege that Washington's felon disenfranchisement scheme results in the denial of the right to vote to racial minorities in violation of the VRA.[1] Both sides move again for summary judgment on all issues.

**DISCUSSION**

**A.  Voting Rights Act Standard**

Assuming § 2 of the VRA does constitutionally apply to Washington's felon disenfranchisement law, the Court shall conduct "a broad, functionally-focused review of the evidence to determine whether a challenged voting practice interacts with surrounding racial discrimination in a meaningful way or whether the practice's disparate impact 'is better explained by other factors independent of race.'" *Farrakhan I*, 338 F.3d at 1018 (citation omitted). If the Court decides Washington's felon disenfranchisement law interacts with racial discrimination in the criminal justice system in a meaningful way, then it shall conduct a "totality of the circumstances" analysis to determine whether the challenged voting practice results in discrimination on account of race. *Id*. at 1015. The Court must do this while "maintaining a practical perspective when evaluating the effects or

---

[1] This Court previously granted Defendants' motion for summary judgment regarding Plaintiffs' claim based on Washington's restoration of civil rights scheme, and this holding was affirmed by the Ninth Circuit. *Farrakhan I*, 338 F.3d at 1022. Accordingly, the Court shall not address this claim a second time.

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 4

lawfulness of a challenged voting practice[.]" *Id*. at 1019 (citing *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986)).

In 1982, Congress amended § 2 of the VRA, inserting the "totality of the circumstances" test to allow a claimant to establish a violation without proving discriminatory intent, "[r]ecognizing the subtle ways that states often denied racial minorities the right to vote." *Johnson*, 405 F.3d at 1227. These amendments in essence created a "results test." *Id*. Section 2 of the VRA now provides in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b) of this section.
> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that . . . members [of protected racial minorities] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973.

Reading subsections (a) and (b) together demonstrates that a claimant must show more than one instance of discriminatory denial or abridgement of the right to vote. For instance, a claimant challenging felon disenfranchisement who may be charged and prosecuted solely and intentionally because he or she is black, Hispanic, or Native American, but who did commit the crime charged, could not prove a violation of § 2 of the VRA from his or her experience alone, no matter how egregious the treatment received. Instead, the claimant must prove, by a preponderance of the evidence, that the totality of the circumstances supports the conclusion that "members" of protected minorities "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" on account of their race or color. *Id*.; *see also Thornburg*, 478 U.S. at 43 (stating that subsection (b) "establishes" that § 2 of the VRA "has been violated" where the totality of the circumstances reveals members

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 5

of a protected class have less opportunity than other members of the electorate to participate in the political process).[2]

Notably, § 2 of the VRA "does not prohibit all voting restrictions that may have a racially disproportionate effect." *Johnson*, 405 F.3d at 1227 (citing *Chisom v. Roemer*, 501 U.S. 380, 383 (1991)); *see also Muntaqim v. Coombe*, 366 F.3d 102, 116 (2d Cir. 2004) (stating that "it is apparent that § 1973 does not prohibit *all* voting restrictions that have a racially disproportional effect" (emphasis in original)) (citing *Thornburg*, 478 U.S. at 47), *rev'd en banc on other grounds*. Furthermore, claimants such as Plaintiffs must show more than mere statistics of a disproportionate impact from Washington's felon disenfranchisement law: "a bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 'results' inquiry. Instead, '[s]ection 2 plaintiffs must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result.'" *Smith v. Salt River Project Agricultural Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997) (*Salt River*) (emphasis and alterations in original) (citation omitted).

The causal connection may be illustrated by showing that the challenged voting practice, here the felon disenfranchisement law, interacts with surrounding racial discrimination, here in the criminal justice system, in "a meaningful way." *See Farrakhan I*, 338 F.3d at 1020. Accordingly, if Washington's felon disenfranchisement law has the "effect of shifting racial inequality from the surrounding social circumstances into the political process," then it should be a

---

[2] The Court could not find case law explicitly supporting the proposition that subsection (b) is the *only* way to prove a violation of § 2 of the VRA. However, the plain language of subsection (a), which ends "as provided in subsection (b) of this section," supports the conclusion that subsection (b) provides the sole method to establish a violation of § 2 of the VRA.

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 6

factor the Court considers when conducting its "totality of the circumstances" analysis under the VRA. *Id*.

B.     **Discrimination in Washington's Criminal Justice System**

The *Farrakhan I* panel concluded that "racial bias in the criminal justice system may very well interact with voter disqualifications to create the kinds of barriers to political participation on account of race that are prohibited by Section 2[.]" 338 F.3d at 1020.  It reasoned that "[t]o the extent that racial bias and discrimination in the criminal justice system contribute to the conviction of minorities for 'infamous crimes,' such discrimination would clearly hinder the ability of racial minorities to participate effectively in the political process, as disenfranchisement is automatic." *Id*.  Therefore, the Court must determine from the evidence presented the extent to which racial bias and discrimination in Washington's criminal justice system contribute to the conviction of minorities for "infamous crimes."

Plaintiffs argue that the interaction of Article VI § 3 of the Washington State Constitution with the criminal justice system, which is "infected with racial discrimination," results in a disproportionate number of racial minorities being disenfranchised following a felony conviction.  They present various expert reports examining racial disparities in the criminal justice system that they claim are not explicable in race-neutral terms.  Defendants counter that Plaintiffs' evidence is based solely on statistics and that statistical evidence alone remains insufficient to establish a violation of § 2 of the VRA.

Plaintiffs rely heavily on an expert report from Robert Crutchfield[3] that

---

[3] Prof. Crutchfield received his Ph.D. from Vanderbilt University in 1980. He is currently a Professor of Sociology and Clarence and Elissa Schrag Fellow in the Department of Sociology at the University of Washington and Acting Associate Dean of the University's Graduate School.  His report was compiled on

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 7

1 focuses on research that has been conducted in Washington on racial and ethnic
2 disparities in the processing of criminal cases.  Significantly, Prof. Crutchfield
3 notes that "[t]he studies of racial and ethnic disparity in Washington State have
4 generally not been designed to uncover the causes of observed differences."  Pls.'
5 Ex. 2 at 4.  In his report, Prof. Crutchfield posits two explanations for the racial
6 disparities reported: (1) discriminatory actions of criminal justice decision makers
7 (either intentional or unconscious); and (2) structural or institutional causes (ways
8 of doing business, such as decision rules that are theoretically race-neutral, but are
9 not race-neutral in practice).  *Id*.  Prof. Crutchfield examined studies regarding
10 police practices and practices in prosecutors' offices, and studies of court and
11 sentencing practices as they relate to race.

12    Prof. Crutchfield explores many potential causes of the racial and ethnic
13 disparities he observed in the studies reviewed.  The causes he considers include
14 some instances of problematic individual behavior, implicit biases, institutional-
15 and societal-level forces such as racial residential segregation, law enforcement's
16 focus on crack cocaine and outdoor markets for drug arrests, and, in making bail
17 decisions, the fact that minorities are more likely to be economically
18 disadvantaged, have less stable employment, experience more family disruptions,
19 and have more residential mobility.  *Id*. at 51-55.

20    Plaintiffs also submit a report by Katherine Beckett.[4]  Her report is more
21 limited in nature in that it analyzes the extent and causes of racial disparities in
22 Seattle drug delivery arrests.  The report was initially commissioned by public
23 defenders associated with Seattle's *Racial Disparity Project* for submission in a
24 criminal case.  Pls.' Ex. 3, at 1.  Since Prof. Beckett prepared the report, she and

---

26 October 25, 2005.

27    [4] Prof. Beckett is an Associate Professor in the Department of Sociology
28 and the Law, Societies & Justice Program at the University of Washington.

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 8

several co-authors have written two separate analyses based on its data and other data submitted in the criminal case. Her opinions expressed here are based on these analyses. *Id*.

To the extent the Court can extrapolate Prof. Beckett's drug-arrest-in-Seattle-specific findings to Washington felony arrests and convictions in general,[5] her report presents several conclusions: (1) in Seattle, a majority of drug users are white (with the possible exception of users of crack cocaine); (2) in Seattle, a majority of those who deliver "serious drugs" are white (with the possible exception of crack cocaine); (3) 52.2 percent of those arrested for possession, and 64.2 percent of those arrested for delivery of serious drugs in Seattle from January 1999-April 2001, were black; (4) Latinos are also over-represented among those arrested for drug possession; and (5) this over-representation is primarily the result of three factors: (A) law enforcement's concentration on the crack cocaine market; (B) law enforcement's concentration on outdoor drug venues; and (C) the geographic focus on outdoor drug venues in Seattle's downtown area. *Id*. Prof. Beckett posits that none of these organizational practices appear to be explicable in race-neutral terms. *Id*. at 1-2. Accordingly, they point directly to the existence of racial discrimination in law enforcement and, consequently, the criminal justice

---

[5] Prof. Beckett submits that approximately 30 percent of all state prisoners, 70 percent of all federal prisoners, and an unknown but likely significant proportion of jail inmates are incarcerated for drug offenses. Pls.' Ex. 3, at 2. Seattle felony drug arrests constitute about 63 percent of all King County felony drug arrests, and 13.7 percent of those sentenced to Washington State prison for "VUCSA" violations are from King County. Prof. Beckett concludes that about 9.3 percent of those in prison in Washington State for violations of the Uniform Controlled Substances Act were arrested in Seattle by local law enforcement agents.

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 9

system in the Seattle area.

The Court finds both of these reports to be compelling evidence of racial discrimination and bias in Washington's criminal justice system.[6] Contrary to Defendants' assertion that these reports are based solely on statistics and are thus insufficient evidence for a VRA claim, the Court finds these experts' conclusions, drawn from the available statistical data, are admissible, relevant, and persuasive.[7]

---

[6] Plaintiffs also submit a report by Professor Morgan Kousser discussing primarily Washington's re-enfranchisement provision and the difficulties it poses to minorities in particular, and a draft law review article discussing the concept of implicit bias. Additionally, Plaintiffs filed a report prepared by the Washington Sentencing Guidelines Commission in 2003 entitled "Disproportionality and Disparity in Adult Felony Sentencing." This report includes the type of "bare statistical evidence" *Salt River* discourages. However, combined with the conclusions drawn by Profs. Crutchfield and Beckett, these statistics and the other reports bolster the Court's conclusion.

[7] Although Plaintiffs' experts cannot pinpoint evidence of discrimination in Washington's criminal justice system, the Court finds their opinions and the statistical evidence on which they are based to be sufficient. The Court likens the experts' conclusions and how they relate to Plaintiffs' VRA claim to the standard of proof for disproportionate impact claims in employment discrimination suits, in which a statistically significant disparity may be sufficiently substantial as to raise an inference of causation. *Paige v. California*, 291 F.3d 1141, 1145 (9th Cir. 2002). Although the panel in *Farrakhan I* states that causation cannot be inferred from impact alone, 338 F.3d at 1019 (citing *Salt River*, 109 F.3d at 595), the facts in *Salt River* from which this conclusion arose were distinguishable from those present here. The plaintiffs in *Salt River* "effectively stipulated to the nonexistence of virtually every circumstance which might indicate that [the disputed voting

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 10

Significantly, Defendants do not present any evidence to refute Plaintiffs' experts' conclusions. Viewing the evidence in a light most favorable to the non-movants, the Court is compelled to find that there is discrimination in Washington's criminal justice system on account of race. Furthermore, this discrimination "clearly hinder[s] the ability of racial minorities to participate effectively in the political process, as disenfranchisement is automatic." *Farrakhan I*, 338 F.3d at 1220.

**C.     Totality of the Circumstances Analysis**

The Court's conclusion that there is discrimination in Washington's criminal justice system that interacts with its felon disenfranchisement law in a meaningful way does not end the inquiry. This conclusion merely renders the racial bias in the criminal justice system "simply another relevant social and historical condition to be considered where appropriate." *Farrakhan I*, 338 F.3d at 1020.

As stated above, Congress amended § 2 of the VRA in 1982 "to relieve plaintiffs of the burden of proving discriminatory intent." *Id.* at 1014. The Senate Report accompanying these amendments included a non-exclusive list of "typical factors" that may be relevant when analyzing the totality of the circumstances to determine whether § 2 of the VRA has been violated:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
> (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
> (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

practice] results in racial discrimination." 109 F.3d at 595. Here, Plaintiffs vigorously assert the statistical disparity and disproportionality evident in Washington's criminal justice system arise from and result in discrimination, and they submit expert reports that substantiate this assertion.

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 11

> (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
> (6) whether political campaigns have been characterized by overt or subtle racial appeals;
> (7) the extent to which members of the minority group have been elected to public office in the jurisdiction;
> (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;
> (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 1015 (citing S. Rep. No. 97-417, at 28-29 (1982)). The Court must conduct its "totality of the circumstances" analysis while "maintaining a practical perspective when evaluating the effects or lawfulness of a challenged voting practice[.]" *Id.* at 1019 (citing *Thornburg*, 478 U.S. at 46).

Plaintiffs assert only Factors 5 and 9 are applicable and relevant to this matter because the issue presented here is vote denial. Defendants disagree, and submit that the Court must consider all of the Senate factors in its totality of the circumstances analysis. Defendants further profess that the factors ignored by Plaintiffs favor the State. Although the Court is not bound by the list of Senate factors, *see id.* at 1019 (stating Congress did not intend the listed factors to be exhaustive), it finds relevance in factors other than numbers 5 and 9.

As the panel in *Farrakhan I* pointed out, evidence of racial bias in the criminal justice system is encompassed within the scope of Factor 5, which directs courts to consider "'the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health.'" 338 F.3d at 1020 (quoting Senate Report at 29). The Court considered this factor *supra*, and finds members of protected groups do experience discrimination within Washington's criminal justice system, leading to a disproportionate number of minority disenfranchised felons. The remaining factors, however, weigh in favor of Defendants' position.

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 12

As the Court stated in its 2000 Order addressing these parties' summary judgment claims, the first Senate factor strongly favors a finding that Washington's felon disenfranchisement law does not violate § 2 of the VRA.

> Plaintiffs have not offered any evidence of a "history of official discrimination in the state . . . that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process," *Thornburg*, 478 U.S. at 36-37, such as to lead the Court to conclude that the circumstances surrounding the disenfranchisement's provision created an inference of discriminatory intent or a causal connection between the provision and the result. To the contrary, Washington has historically been very liberal in extending elective franchise to racial minorities. *See* Affidavit of Dr. Quintard Taylor at ¶¶ 17, Ct. Rec. 130, ex. 47 (concluding that Washington's political process has historically been open to minorities, and that its felon disenfranchisement provision was not intended to disenfranchise racial minorities); Deposition of Dr. Quintard Taylor, p. 38, ll. 3-14, Ct. Rec. 13, ex. 11 (same). Plaintiffs concede that Washington has no history of official acts aimed at limiting the voting rights of African-Americans, but cite 2 examples allegedly evidencing a political climate hostile to minorities at the time the Washington Constitution was drafted: (1) a proposed constitutional provision barring persons of Chinese descent from voting; and (2) the exclusion of "Indians not taxed" from voter roles in Washington's Constitution as originally drafted. Plaintiffs' first example is not evidence of discrimination; to the contrary, the delegates' rejection of this proposal evidences an intent to promote or delimit minority voting. This rejection is particularly significant because it occurred at a time when anti-Chinese attitudes were prevalent in the Pacific Northwest. *See* Affidavit of Quintard Taylor at ¶15, Ct. Rec. 130, ex. 47. Similarly, the original exclusion of "Indians not taxed" from Washington's voter roles has a much more benign explanation than that suggested by Plaintiffs when viewed in historical context. Most Native Americans were not legally regarded as full citizens of the United States until 1924. *See, e.g.*, *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987). *See also* Wash. Rev. Code § 75.56.040. Reservation land and Native Americans living on reservations were historically regarded as beyond the State's taxing power. *See McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 169 (1973). Accordingly, a voting qualification omitting "Indians not taxed" merely distinguishes between citizens and non-citizens of a state. This interpretation is consistent with Washington case-law. *See Anderson v. O'Brien*, 84 Wash.2d 64, 85-86 (1974) (Hale, C.J., dissenting).

(Ct. Rec. 153, at 6-8) (internal footnotes omitted). This remarkable absence of any history of official discrimination in Washington factors heavily in the Court's totality of the circumstances analysis.

It is Plaintiffs' burden to show the Senate factors weigh in their favor. Plaintiffs have not carried this burden in that they failed to present any substantial

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 13

evidence regarding many of the other Senate factors, including those considering racial polarization of the vote, various voting mechanisms, candidate slating processes, or the use of racial appeals in political campaigns. Admittedly, several of these factors are not relevant in a VRA vote denial claim. Still, Plaintiffs have not presented any evidence on the extent to which minority group members have been elected to political office in Washington or the level of responsiveness elected officials have to the particularized needs of members of minority groups. These factors are certainly relevant to Plaintiffs' VRA claim. Plaintiffs' failure to produce any evidence to the contrary leads the Court to believe these factors favor Defendants' position.

Plaintiffs have come forward with evidence on what they characterize as "tenuous" policy justifications for Washington's felon disenfranchisement law. Plaintiffs submit an expert report questioning the policy justifications behind the law, and they cite as support for their position a 1972 Ninth Circuit decision, *Dillenburg v. Kramer*, 469 F.2d 1222 (9th Cir. 1972). In *Dillenburg*, the court considered an Equal Protection challenge to Washington's felon disenfranchisement laws. *Id*. at 1224. The court comments that courts in general "have been hard pressed to define the state interests served by laws disenfranchising persons convicted of crimes," and remarks that "[w]hen the façade of the classification [of offenses that result in disenfranchisement] has been pierced, the disenfranchising laws have fared ill." *Id*. As in *Dillenburg*, the State here does not explain why disenfranchisement of felons is "necessary" to vindicate any identified state interest. *Id*. at 1225.

However, the *Dillenburg* court does recognize that felon disenfranchisement laws have been upheld repeatedly. *Id*. Unlike other state voting qualifications, the Constitution of the United States recognizes the states' power to disenfranchise felons. U.S. Const. amend. XIV, § 2; *see also Richardson v. Ramirez*, 418 U.S. 24, 54 (1974) (explaining that "the exclusion of felons from the vote has an affirmative

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 14

sanction in section 2 of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated [in other cases]"). Moreover, "[t]oday, all states except two have some form of criminal disenfranchisement provision." *Johnson*, 405 F.3d at 1228. In spite of the Ninth Circuit's holding in *Dillenburg*, this Court's ability to examine the tenuousness of Washington's felon disenfranchisement laws is extremely limited. *Accord id.* at 1235 (stating that "Federal courts cannot question the wisdom of this policy choice"). Therefore, the Court concludes the ninth Senate factor also favors Defendants' position.

      Although the evidence of racial bias in Washington's criminal justice system is compelling, it is simply one factor in the totality of the circumstances the Court must consider when evaluating Plaintiffs' § 2 claim. The Court has no doubt that members of racial minorities have experienced discrimination in Washington's criminal justice system. If the denial or abridgement of *one citizen's* right to vote "on account of race or color" established a violation of § 2 of the VRA, this Court would find for Plaintiffs in this matter. However, the statutory language of subsection (a) of § 2 of the VRA limits its application to those circumstances the totality of which establish the existence of discrimination in voting on a broader scale. Other factors, particularly Washington's history, or lack thereof, of racial bias in its electoral process and in its decision to enact the felon disenfranchisement provisions, counterbalance the contemporary discriminatory effects that result from the day-to-day functioning of Washington's criminal justice system. Taking all of the relevant factors into account, the Court finds that the totality of the circumstances does not support a finding that Washington's felon disenfranchisement law results in discrimination in its electoral process on account of race.

      Accordingly, **IT IS HEREBY ORDERED:**

      1. Defendants' Motion for Summary Judgement (Ct. Rec. 215) is

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 15

1 | **GRANTED**.

2 |     2. Plaintiffs' Motion for Summary Judgment (Ct. Rec. 230) is **DENIED**.

3 |     3. The District Court Executive is directed to enter judgment for Defendants on all claims.

    **IT IS SO ORDERED.** The District Court Executive is directed to enter this Order, forward copies to counsel, and **close the file**.

    **DATED** this 7th day of July, 2006.

*s/ Robert H. Whaley*

ROBERT H. WHALEY
Chief United States District Judge

Q:\CIVIL\1996\Farrakhan\sj.ord.wpd

ORDER GRANTING DEFENDANTS' MOTION, DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT * 16